AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Purple iPhone Cellular Phone
Case Number: SYS-24-02-0161
("Target Device 2")

Case No. '24 MJ1034

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8, USC sec. 1324(a)(2)(B)(iii) | Bringing Illegal Aliens without Presentation |

The application is based on these facts:
See Attached Affidavit of CBP Enforcement Officer Mario Valdes, U.S. Customs and Border Protection, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days *(give exact ending date if more than 30 days: ___)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Mario Valdes-Vazquez, US Customs and Border Protection
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: 03/07/2024

*Judge's signature*

City and state: San Diego, California — Hon. Michelle M. PETTIT, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-2

PROPERTY TO BE SEARCHED

The following property is to be searched:

    Purple iPhone Cellular Phone

    Case Number: SYS-24-02-0161

    **("Target Device 2")**

**Target Device 2** is currently in the custody of the Department of Homeland Security, Customs and Border Protection, 720 E. San Ysidro Blvd., San Ysidro, CA.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of February 5, 2024, up to and including February 19, 2024:

a. tending to indicate efforts to bring in aliens without presentation from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the bringing in of aliens without presentation;

c. tending to identify co-conspirators, criminal associates, or others involved in the bringing in of aliens without presentation;

d. tending to identify travel to or presence at locations involved in the bringing in of aliens without presentation, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324(a)(2)(B)(iii).

# AFFIDAVIT

I, Mario Valdes-Vazquez, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for warrants to search the following electronic devices:

> Black iPhone Cellular Phone
>
> Case Number: SYS-24-02-0161
>
> (**"Target Device 1"**)
>
> Purple iPhone Cellular Phone
>
> Case Number: SYS-24-02-0161
>
> (**"Target Device 2"**)

Collectively the "Target Devices", as further described in Attachments A-1 and A-2 and to seize evidence of crime, specifically, violations of Title 8, United States Code, Section 1324(a)(2)(B)(iii) (bringing in certain aliens without presentation), as further described in Attachment B.

2. The requested warrant relates to the investigation and prosecution of Jazmine BAUTISTA Barragan and Ana Esmeralda MURATALLA for Bringing in Illegal Aliens without Presentation into the United States. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, 720 E. San Ysidro Blvd., San Ysidro, CA.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement

1

personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4. I have been employed by U.S. Customs and Border Protection since 2005 and am currently assigned to the San Ysidro Criminal Enforcement Unit. I graduated from the CBP Basic Academy at the Federal Law Enforcement Training Center in Glynco, Georgia. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a CBP Officer, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle

aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media,

or messaging applications when contact is lost with the driver after an apprehension has occurred.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a. tending to indicate efforts to bring in aliens without presentation from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used the bringing in of aliens without presentation;

    c. tending to identify co-conspirators, criminal associates, or others involved in of the bringing in of aliens without presentation;

4

d. tending to identify travel to or presence at locations involved in the bringing in of aliens without presentation, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On Monday, February 19, 2024, at approximately 5:34 P.M., Jazmine BAUTISTA Barragan, Defendant 1 (D1) and Ana Esmeralda MURATALLA, Defendant 2 (D2), occupying a GMC Acadia driven by D1, applied for admission into the United States at the San Ysidro, California Port of Entry from Tijuana, Mexico (MX). During pre-primary canine roving operations, a canine alerted to the rear bench seat area of the vehicle. Upon inspection before a United States Customs and Border Protection (CBP) Officer, D1 presented a valid United States Passport and D2 presented a valid California Driver's License. D1 and D2 both stated they were going to Los Angeles, California and had nothing to declare. During the pre-primary inspection, the CBP Officer discovered an individual that was hiding under a dark colored blanket between the second and third row bench seat area of the vehicle. D1 and D2 were then escorted to the Security Office for further disposition.

12. In the Vehicle Secondary inspection area, CBP officers conducted a search of the vehicle and confirmed that one individual was hiding under the dark colored blanket, lying on the floor between the second and third row bench seat area. CBP officers assisted

5

one male individual, later identified as Eric Eduardo MENDEZ Pacheco, the Material Witness (MW), out of the area between the second row and third row seat area. MW is a citizen and national of Mexico without legal entry documents to enter or pass through the United States.

13. At approximately 6:36 P.M., D1 was advised of her *Miranda* Rights and elected to give a statement. D1 stated she is not the registered owner of the GMC Acadia. D1 claimed that her high school friend "Ruben", rented the GMC Acadia for her through an application known as Turo.

14. D1 stated that on February 17, 2024 she and D2 drove non-stop, from Sacramento, CA to Rosarito, Mexico. She said it took a total of nine hours to reach their destination. D1 stated that they both took turns driving the vehicle. D1 stated that they checked into a hotel, booked by D2, upon their arrival in Rosarito, MX. D1 claimed the vehicle was parked from the time she arrived at the hotel until she checked out at 11:00 A.M on February 19, 2024. D1 claimed after checking out of the hotel, she went shopping and went to eat at a restaurant with D2. D1 stated that after eating, she made no stops until she arrived at the San Ysidro Port of Entry. D1 referred to MW as "him," despite claiming to not know that anyone was in the car and without CBP officers telling her the MW's gender.

15. At approximately 7:19 P.M., D2 was advised of her *Miranda* Rights and elected to give a statement. D2 stated that D1 and her friend Viviana "VV" Morales picked her up from her house in Sacramento, CA. D2 stated that before going to Rosarito, MX, she and D1 stopped in Los Angeles, CA to visit friends. D2 stated she did not drive the GMC Acadia at any point during the trip. D2 stated that she did not book the hotel where they stayed in Rosarito. D2 admitted to knowing the GMC Acadia was a rented through the Turo app. D2 stated she has no knowledge of who Ruben is, even though she was classmates with D1 in high school.

16. The MW also was interviewed. He claimed that he took an airplane from Oaxaca, MX to Tijuana, MX on Thursday, February 15, 2024. MW stated he was picked up by an unknown male from the airport. MW stated the unknown male cared for him at the house where he was being held. MW admitted his father made the smuggling arrangements from Oaxaca, MX and he was going to pay $15,000 U.S. Dollars. MW admitted the unknown male placed him between the second and third row seat area and covered him utilizing the dark colored blanket. MW admitted to hearing two different female voices while hiding in the GMC Acadia. MW admitted the female voices were instructing him not to move and to be quiet. MW stated that after receiving instructions from the females, the vehicle made no stops until they were apprehended at the port of entry.

17. D1 was found in possession of the **Target Device 1** (Black iPhone Cellular Phone) during initial arrest. During a post arrest interview, D1 claimed ownership of the **Target Device 1**. The **Target Device 2** (Purple iPhone Cellular Phone) was found inside the cup holder of the vehicle during initial arrest. During a post arrest interview, D2 claimed ownership of the **Target Device 2**. The **Target Devices** was subsequently seized and is now being held as evidence by Customs and Border Protection.

18. Based upon my experience and training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the **Target Devices** to communicate with others to further the smuggling of illegal aliens into the United States. Further, in my training and experience, alien smugglers may be involved in the planning and coordination of transporting and smuggling events in the days

7

and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the aliens. Based on my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on February 5, 2024, up to and including February 19, 2024.

## METHODOLOGY

19. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones, tablets, and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored

8

that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

20. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

21. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

22. Law enforcement has not attempted to extract data from the **Target Devices**. Law enforcement is now seeking to obtain the evidence in the **Target Devices** through this warrant.

## CONCLUSION

23. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of alien smuggling violation of Title 8, United States Code, Section 1324(a)(2)(B)(iii).

Accordingly, I request that the Court issue warrant authorizing law enforcement to search the item described in Attachments A-1 and A-2 and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Mario Valdes-Vazquez, CBP Enforcement Officer

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 7th day of March, 2024.

_____
HON. Michelle M. PETTIT
United States Magistrate Judge

10

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of February 5, 2024, up to and including February 19, 2024:

a. tending to indicate efforts to bring in aliens without presentation from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the bringing in of aliens without presentation;

c. tending to identify co-conspirators, criminal associates, or others involved in the bringing in of aliens without presentation;

d. tending to identify travel to or presence at locations involved in the bringing in of aliens without presentation, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324(a)(2)(B)(iii).